IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 16, 2021 Session

## STATE OF TENNESSEE v. MICHAEL DILLON LAMBDIN

**Appeal from the Criminal Court for Knox County**
**No. 107896        Steven W. Sword, Judge**

FILED

APR 0 7 2022

Rec'd by
Clerk of the Appellate Courts

## No. E2020-01590-CCA-R3-PC

The Petitioner, Michael Dillon Lambdin, appeals the post-conviction court's denial of his petition seeking relief from his conviction for first degree felony murder and life sentence. In this appeal, the Petitioner contends that he received ineffective assistance of trial counsel because (1) counsel failed to file a motion to suppress the Petitioner's police statement due to the Petitioner's intoxication; (2) counsel failed to object to crime scene and autopsy photographs; (3) counsel introduced a prejudicial crime scene photograph of the victim; (4) counsel failed to object to an improper statement made during the State's rebuttal argument; and (5) counsel failed to request an accomplice jury instruction in writing. The Petitioner also asserts that the cumulative effect of these errors deprived him of a fair trial. After reviewing the record and the applicable authorities, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JILL BARTEE AYERS, JJ., joined.

Gregory P. Isaacs and J. Franklin Ammons, Knoxville, Tennessee, for the Appellant, Michael Dillon Lambdin.

Herbert H. Slatery, III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie R. Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

The Petitioner was convicted of first degree felony murder based upon his participation in the December 17, 2009 attempted robbery and shooting death of Vincent Presutto (the victim). See State v. Michael Lambdin, No. E2014-00547-CCA-R3-CD, 2015 WL 1897461, at *1 (Tenn. Crim. App. Apr. 27, 2015). The Petitioner was tried jointly with Frederick Keith, and accomplice Anthony White entered a plea agreement in exchange for his trial testimony against the Petitioner and co-defendant Keith.

The trial testimony established that the victim was a "small-time" opiate dealer and drug user from whom the Petitioner often purchased pills. Lambdin, 2015 WL 1897461, at *1. On December 17, 2009, the Petitioner and the victim met at a grocery store, where the Petitioner purchased a pill, and they discussed the victim's drug supply. At that time, co-defendant Keith and Mr. White were drinking alcohol at the home of Mr. White's girlfriend, Natalie Freeman. After the grocery store drug exchange, the Petitioner called Mr. White and co-defendant Keith wanting to "hang out." The two men picked up the Petitioner before returning to Ms. Freeman's home.

During the trip, the Petitioner and co-defendant Keith discussed robbing the victim of his large quantity of pills. Lambdin, 2015 WL 1897461, at *1. According to Mr. White, the Petitioner said that the victim was "[a] pushover" and someone who could "easily [be] taken advantage of[.]" The robbery conversation continued once they were inside Ms. Freeman's home, and the group continued to drink alcohol. Ms. Freeman testified that the Petitioner wanted to rob the victim because he was angry that the victim had raised his prices. The Petitioner wanted Mr. White to drive and for co-defendant Keith to "be his muscle." The Petitioner's plan was to enter the apartment when the victim answered the door, then co-defendant Keith, who would be armed, would "rush in after that," and appear to rob both men in order to remove suspicion from the Petitioner. After co-defendant Keith took the victim's pills, the Petitioner was supposed to return to the truck. Mr. White would receive "some small remuneration" for his driving services.

Ms. Freeman testified that the Petitioner pulled out a silver revolver with "a six-shooter type spin on it" while he was inside her home. Lambdin, 2015 WL 1897461, at *2. The Petitioner called the victim and arranged the meeting before the three men left around 11:00 p.m. in Mr. White's truck; Ms. Freeman saw co-defendant Keith with the gun at this time. The Petitioner was wearing blue jeans, a t-shirt, "a camouflage type jacket that zipped up," and a camouflage baseball cap. Co-defendant Keith was wearing blue jeans, a t-shirt, a colorful hoodie, and a blue and red toboggan.

After arriving at the victim's apartment complex, the Petitioner and co-defendant Keith proceeded to the apartment while Mr. White waited in the truck. Lambdin, 2015 WL 1897461, at *2. Mr. White backed into a different parking spot after an SUV arrived. The

-2-

Petitioner returned to the truck first and was almost hit by the SUV. The driver of the SUV, Barbara Eaton, was later able to identify the Petitioner from a photographic lineup. According to Mr. White, the Petitioner appeared "[s]kittish" and afraid when he returned to the truck. After a few minutes, co-defendant Keith "jumped in the truck and said, 'Go fat man. Go.'" Co-defendant Keith was "furious," and he punched the dashboard and relayed that the victim fought back and that the gun "went off[.]" Mr. White did not see either man with the gun during the return trip.[1] The Petitioner said to co-defendant Keith, "Don't kill me."

Neighbors called 911 after hearing gunshots and the victim's crying for help. Lambdin, 2015 WL 1897461, at *2. The police found the Petitioner's camouflage hat "just inside the door in the blood" and co-defendant Keith's blue and red toboggan on a ledge outside the apartment. The Petitioner's Smith & Wesson six-shot revolver was lying in the doorway. No pills were found inside the residence, although the police saw empty pill bottles inside. The bullet that killed the victim was fired at a downward trajectory from outside the door; it pierced the doorframe and struck the victim near the collarbone. It appeared that the victim was in a crouched position when he was hit, which possibly indicated that he was trying to close the door and force someone out of the apartment. Telephone records reflected that the victim and the Petitioner communicated throughout the day and that the victim used his cell telephone to call 911 at 11:18 p.m.

The autopsy indicated that the victim had wounds on his hands consistent with his having grabbed the gun, suggesting that a struggle took place before the victim was shot. Lambdin, 2015 WL 1897461, at *2. The victim had also been pistol-whipped in the head after he was shot. The victim's blood tested positive for therapeutic levels of methadone and relatively high levels of oxycodone, and the toxicology report also indicated recent marijuana and cocaine use.

Ms. Freeman testified that when the three men returned to her house, the Petitioner and co-defendant Keith were no longer wearing their hats, and none of the men had the revolver in their possession. Lambdin, 2015 WL 1897461, at *2. Ms. Freeman described co-defendant Keith as "out of sorts" and "in shock, very, very white." Co-defendant Keith relayed to Ms. Freeman that when they arrived at the victim's apartment, the Petitioner went inside, came back outside, and ran away. Co-defendant Keith told her that the gun was left on the ground, that the victim picked up the gun, that the victim and co-defendant Keith fought over the gun, and that the gun went off and shot the victim during the struggle.

---

[1] Although it was not included in this court's recitation of the facts in the Petitioner's direct appeal, the trial transcript reflects that Mr. White testified that the Petitioner referred to having his "papaw's" gun during the initial car ride to Ms. Freeman's house and that he showed Mr. White the gun at the house before they went to the victim's apartment.

Ms. Freeman further described the Petitioner as hysterical, crying, and yelling about losing his gun, which was "a family heirloom." Lambdin, 2015 WL 1897461, at *3. Mr. White stated that the Petitioner was also upset about losing his hat. According to Mr. White, co-defendant Keith was mad at the Petitioner for running away and not helping with the robbery. Both men relayed to Mr. White that "they didn't get nothing" from the victim.

Mr. White and Ms. Freeman hid Mr. White's truck from the police behind St. Mary's Hospital. Lambdin, 2015 WL 1897461, at *3. Mr. White and the Petitioner stayed the night at Ms. Freeman's home. Co-defendant Keith left sometime in the middle of the evening, and he eventually fled the state.

The Petitioner testified in his own defense at trial, claiming that he made a "horrible mistake" and that co-defendant Keith was the one who orchestrated the attempted robbery. Lambdin, 2015 WL 1897461, at *3. According to the Petitioner, co-defendant Keith asked him for his gun and told him that no one would get hurt. The Petitioner stated that he went inside the victim's apartment alone because the victim closed the door behind him before co-defendant Keith had an opportunity to enter. In an attempt to have the victim open the door again, the Petitioner told the victim that he had left his wallet in the truck and would return with the money. However, the victim offered to let the Petitioner purchase the pills on credit. The Petitioner insisted that he go get his wallet from the truck, and he left the residence. The Petitioner claimed at trial that he decided to abandon the robbery at this point because the victim had been "nice" to him, but that co-defendant Keith insisted on completing the robbery. According to the Petitioner, co-defendant Keith took the Petitioner's hat so that the victim would believe co-defendant Keith was the Petitioner. The Petitioner heard a gunshot as he returned to the truck. The Petitioner admitted that his trial testimony was the first time that he had recounted this version of the events.

The jury convicted the Petitioner as charged, and he was sentenced to life imprisonment. Lambdin, 2015 WL 1897461, at *3. In the direct appeal of his convictions, the Petitioner argued that the evidence was insufficient to establish the underlying felony, to wit: attempted robbery, and that the State failed to prove that the victim's killing was in furtherance of attempted robbery because the Petitioner abandoned the robbery before the shooting. This court concluded that the evidence of the attempted robbery was sufficient, noting that it was undisputed that the Petitioner participated in planning the robbery; that he was angry with the victim; that he assured the other men that the victim was a "pushover"; that he provided the weapon to co-defendant Keith; that he traveled to the victim's apartment, approached it, and was seen walking away from the apartment shortly before co-defendant Keith; and that no pills were found inside the victim's apartment. Id. at *5.

Relative to the Petitioner's argument that he abandoned the robbery attempt, this court stated that the jury rejected the Petitioner's testimony and concluded that "the underlying . . . attempted robbery and the killing were part of a continuous transaction with no break in the chain of events or, stated another way, that the killing was committed in pursuance of the attempted robbery and not collateral to it." Lambdin, 2015 WL 1897461, at *3. This court noted that the trial court declined to instruct the jury on abandonment as an affirmative offense because the Petitioner made no attempt to prevent the robbery or alert the authorities after the alleged abandonment.

A. Post-Conviction Petition

On April 25, 2016, the Petitioner filed a post-conviction petition alleging that he received ineffective assistance of trial counsel, arguing that (1) counsel failed to file a motion to suppress the Petitioner's police statement on the ground that the Petitioner was intoxicated when he gave it; (2) counsel was under the influence of prescription medications during the representation; (3) counsel failed to request a jury instruction on accomplice testimony in writing; (4) counsel failed to object to cumulative and prejudicial crime scene and autopsy photographs of the victim; (5) counsel entered a prejudicial crime scene photograph as an exhibit; (6) counsel failed to object to the prosecutor's improperly vouching for Mr. White's and Ms. Freeman's credibility during closing arguments; (7) counsel failed to file a motion for discovery; and (8) the cumulative effects of these errors deprived him of a fair trial. Before the post-conviction hearing, the Petitioner withdrew his claim relative to counsel's having been intoxicated during the representation.

B. Post-Conviction Hearing

The Petitioner testified that at the time of the incident in this case, he was nineteen years old and had completed a technical school certificate in "[e]lectrical." He retained trial counsel, posted bond, and was tried in August 2012. He stated that after his initial meeting with counsel, he did not see counsel again until they had three or four meetings just before trial. The Petitioner noted that other than the arraignment, he had no pretrial hearings. Some of the meetings with counsel lasted three or four hours, and others lasted ten or fifteen minutes. Defense investigator Gary Lamb attended some of the meetings.

The Petitioner testified that he reviewed with trial counsel the potential witness testimony and anticipated evidence. He stated that counsel conveyed that the State was unwilling to engage in plea negotiations, that the State was "after" the Petitioner, and that Mr. White had received a plea offer. To the Petitioner's recollection, Mr. White served eight months in jail and was sentenced to twelve years' probation in exchange for his testimony.

The Petitioner testified that he gave a police statement on December 17, 2009, after having ingested two forty-milligram Oxycontin pills and "a couple of totem pole[s]" of Xanax. He recalled that the police statement was used during trial. The Petitioner stated that Xanax made a person calm and unable to think clearly and that a person would "say anything" on the drug. He said that Oxycontin made a person irritable and "run off at the mouth." The Petitioner noted that he had taken Oxycontin previously but had not used Xanax much before the police interview. When asked whether the substances impacted his demeanor, the Petitioner said, "I mean, I really can't tell you." The Petitioner recalled "a little bit" his signing a rights waiver, although he did not remember how well the officer explained it. The Petitioner claimed that if he had been sober, he would have asked for an attorney instead of speaking to the officer.

The video recording of the Petitioner's police interview was introduced as an exhibit at the post-conviction hearing. The recording reflected that during the interview, the Petitioner answered Investigator Lee's questions responsively, narrated longer answers when appropriate, sat normally in his chair, and did not slur his words or otherwise exhibit motor skill difficulties. The Petitioner also asked questions about how to sign the advice of rights form and indicated that he wanted to tell Investigator Lee what happened. The Petitioner repeatedly articulated concern for his and his family's safety if co-defendant Keith and Mr. White learned of his cooperation. Investigator Lee's demeanor was subdued, and he discussed his having worked long hours the previous day while investigating the murder. Investigator Lee encouraged the Petitioner to be honest but never raised his voice or physically imposed on the Petitioner's space. Investigator Lee reviewed each of the Petitioner's Miranda rights and explained the advice of rights form thoroughly.

The Petitioner continued his post-conviction testimony and stated that because of the drugs he took, his ability to recall the incident accurately during the interview was "somewhat" altered. He did not remember telling the police that he only owned rifles. He said that the drugs impacted his ability to accurately describe his gun ownership and "quite a few" other aspects of his statement. He agreed that at trial, he admitted that the handgun was his. The Petitioner noted that he had read his statement in the trial transcript, but he maintained that he did not remember giving the statement.

The Petitioner testified that he recalled telling the police that he intended to purchase pills from the victim. He agreed that he stated at trial that co-defendant Keith intended to rob the victim. The Petitioner recalled reading in his police statement that "someone came running up" as he approached the victim's door. He agreed that at trial, he testified that he went inside the apartment and exited before co-defendant Keith appeared. The Petitioner explained that when he spoke to the police, he was "high and saying whatever [he] thought [he] needed [to say]." The Petitioner thought that he denied hearing a gunshot in his statement, whereas at trial he testified that he heard one gunshot. The Petitioner denied that trial counsel ever inquired as to whether he was under the influence of drugs at the

-6-

time of the police statement. The Petitioner averred if trial counsel had asked, he would have told counsel about his drug use, its impact on his statement, and his unwillingness to speak to the police were he sober.

The Petitioner testified that trial counsel never explained the defense strategy. However, he also stated that counsel sought to minimize the Petitioner's involvement, cast blame on co-defendant Keith, emphasize that the Petitioner did not pull the trigger, and obtain a conviction for facilitation.

On cross-examination, the Petitioner testified that he spoke to the police on December 19, 2009, and that he had no previous criminal history other than a traffic ticket. He agreed that he was unfamiliar with being interviewed by the police and that Knoxville Police Investigator Lee was "mild mannered" and not "hateful." The Petitioner affirmed that Investigator Lee never pressured him. He stated that he answered all of Investigator Lee's questions. The Petitioner did not remember whether he said he did not understand a question or fell asleep during the interview. He agreed that the video recording of the interview was "the best evidence" of his demeanor since he did not remember it.

The Petitioner testified that he never told Investigator Lee about his drug use, and he noted that he was never asked about it. He stated that he had been abusing opiates for between twelve and eighteen months at the time of the incident. He agreed that he was an addict at the time. The Petitioner stated that he took one or two Oxycontin pills per day and that if he missed a dose, he would sometimes become sick. When asked whether drug addicts took drugs "just to be normal," the Petitioner responded, "Sometimes, I guess, if you're that bad off." The Petitioner did not remember if he asked for a break during the interview and did not think he became sick. He recalled telling Investigator Lee that he was afraid of co-defendant Keith and that he feared for his and his family's safety. The Petitioner agreed that he told Investigator Lee that he was attacked at the victim's house. The Petitioner said that he knew "parts of" the statement were false. When asked whether he was trying to avoid being arrested, the Petitioner responded, "I was messed up, [nineteen] and scared and doing what I thought I needed to do at the time . . . . I wasn't thinking clearly." He agreed that although nineteen-year-olds were less mature than an older adult and could act "rashly," they were legal adults. The Petitioner acknowledged that his police statement was different from his trial testimony.

The Petitioner testified that before trial, trial counsel discussed the Petitioner's trial testimony and the defense theory of arguing for facilitation as a lesser-included offense. The Petitioner "guess[ed]" that the defense theory was a good one for a young defendant without a criminal record. He agreed that the evidence against him and co-defendant Keith was strong, including a witness who saw him fleeing in the apartment parking lot and could describe the Petitioner's clothing. The Petitioner did not remember whether he left a hat

-7-

in the victim's apartment; however, he recalled that his pistol was left in the apartment. The Petitioner acknowledged that telephone records reflected "a lot of phone activity" between him and the victim on the day of the incident, although he did not remember missing a call from the victim and returning the call around 2:00 p.m. He similarly did not know whether he and the victim called one another eighteen times that day, and he did not remember hearing trial testimony about the number of calls or the times at which they occurred. He agreed, though, that the victim communicated with him and not co-defendant Keith.

The Petitioner testified that Mr. White was the driver and did not exit the car at the victim's apartment. The Petitioner described Mr. White as "somewhat" of a friend, but denied that Mr. White had visited him in prison or that Mr. White was listed on the Petitioner's "visitation list." The Petitioner stated that he knew Ms. Freeman "somewhat." He agreed that Mr. White's and Ms. Freeman's testimony and the other evidence provided strong proof that he was involved in the offense.

The Petitioner testified that during his trial testimony, he admitted that he was in the car with Mr. White and co-defendant Keith, that he was at the victim's apartment, that the gun was his, and that he fled the scene. The Petitioner agreed that his defense was that he changed his mind about robbing the victim and that he was sorry. He recalled stating at trial that he cried and was "sick to [his] stomach" after the incident, and he agreed that Mr. White also testified about the Petitioner's demeanor. When asked whether the defense theory was "about the best defense that [he] could have," the Petitioner disagreed, averring that trial counsel should have tried to "get [him] a plea." He acknowledged that he did not know the prosecutor and that the State did not always make plea offers. He did not know if counsel was experienced and "guess[ed]" that counsel knew the State's position better than he did.

On redirect examination, the Petitioner averred that his trial testimony was truthful because he was not intoxicated or using drugs anymore. Similarly, he affirmed that his post-conviction hearing testimony was truthful because he was not taking illegal drugs. He stated that he was not pleased with trial counsel's representation.

On recross-examination, the Petitioner testified that he was displeased "because of all of it" and did not feel he was treated fairly. When asked if the victim would be alive if he had not taken co-defendant Keith to the victim's apartment, the Petitioner stated that he did not know; however, the Petitioner acknowledged that the victim would not have been killed with the Petitioner's gun.

Investigator Lee testified that he interviewed the Petitioner on December 19, 2009, at about 2:15 p.m. He stated that the Petitioner came in of "his own accord" after

-8-

Investigator Lee attempted to contact him the previous day. Investigator Lee acknowledged that the Petitioner was young. He did not remember anyone's accompanying the Petitioner, although he noted that it was possible the Petitioner's mother was there. Investigator Lee did not think that the Petitioner appeared to be under the influence of an intoxicant. He noted that the Petitioner was "pretty well-spoken" and appeared to understand his questions. Investigator Lee affirmed that he advised the Petitioner of his constitutional rights and that the Petitioner signed the waiver of rights form. He stated that the interview was lengthy and that it was video-recorded.

Investigator Lee testified that he had previously interviewed people under the influence of drugs and that he had observed people who appeared to be falling asleep or were incoherent. He did not recall the Petitioner's exhibiting any such behavior during the interview.

Investigator Lee testified at the Petitioner's trial and agreed that "independent witnesses" corroborated the Petitioner's involvement in the incident. Investigator Lee interviewed Ms. Eaton, and he noted that the Petitioner's hat and gun were found in the victim's apartment. He stated that co-defendant Keith's hat was also found inside the doorway and that the hat contained co-defendant Keith's DNA. Investigator Lee said that during the interview, the Petitioner eventually acknowledged that the gun was a "family heirloom."

On cross-examination, Investigator Lee testified that he had not met the Petitioner before his interview. He acknowledged that substance use could influence a person's motor skills, ability to think clearly, and ability to "appreciate the significance of events[.]" Investigator Lee stated that in spite of not being familiar with the Petitioner's "baseline demeanor," he would have "noticed that something would have been a concern for [him]" based upon his experience. He agreed that substances affected individuals differently, including Oxycontin and Xanax.

Investigator Lee affirmed that he knew narcotics were involved in the victim's murder. He denied asking the Petitioner if he had taken any drugs prior to the interview. Investigator Lee elaborated that at the time, although he believed the Petitioner probably used drugs, he did not think the Petitioner was "overly under the influence" based upon their interactions. He agreed that drug use could impact a person's ability to maintain employment.

Private investigator Gary Lamb[2] testified that he worked with trial counsel for twelve years and that he assisted counsel in the Petitioner's case in 2012 before the trial.

---

[2] Trial counsel passed away on October 21, 2014, in a single-car accident.

He and counsel discussed developing a defense strategy seeking a conviction for a lesser-included offense. Mr. Lamb agreed that the evidence was a "fairly strong case" against the co-defendants. He stated that he and counsel met with the Petitioner several times to discuss the trial strategy and prepare the Petitioner for trial. Counsel was confident that the case would proceed to trial. Mr. Lamb did not remember whether any plea offers had been made. Mr. Lamb recalled that the Petitioner's trial testimony was inconsistent with his police interview.

Mr. Lamb testified that co-defendant Keith filed a motion to sever his trial from the Petitioner's trial and that trial counsel opposed the motion. Mr. Lamb agreed that a joint trial was important to the Petitioner's defense because co-defendant Keith was "more culpable" according to the proof. Mr. Lamb identified counsel's written motion in opposition to the motion to sever. Mr. Lamb agreed that trial counsel had tried "a lot of murder trials" and that counsel was an experienced trial lawyer who cared about his clients.

On cross-examination, Mr. Lamb testified that it was important to the defense theory that the jury dislike co-defendant Keith and sympathize with the Petitioner. He did not recall discussing with trial counsel any request for an accomplice instruction. Mr. Lamb acknowledged that experienced attorneys sometimes made mistakes.

At the post-conviction hearing, no testimony addressed the crime scene and autopsy photographs raised in the post-conviction petition. However, the trial record was exhibited to the post-conviction hearing, and post-conviction counsel introduced color copies of the photographs, which had also been attached to the post-conviction petition. The post-conviction exhibits and trial record reflect that the Petitioner raised trial counsel's failing to object to one crime scene photograph, trial exhibit 5B, and twenty-nine autopsy photographs in collective trial exhibit 24: 24A-D, F-L, V-EE, II-JJ, and NN-SS.[3] In addition, the Petitioner argued that counsel was ineffective for introducing a crime scene photograph, trial exhibit 18.

Exhibit 5B depicted the victim on a gurney being treated by medical personnel. Blood was on the victim's torso, arms, and hands, but his face was not visible. The relevant autopsy photographs were close-up images of the gunshot entry wound on the victim's collarbone, which had been stitched shut during the victim's surgery before his death, the open wound after the pathologist removed the sutures, and wounds on the victim's scalp, back, and hands. Three photographs showed a trajectory rod inserted into the gunshot wound, and fourteen photographs showed the Petitioner's pistol held up near the victim's scalp and hand. The trial record reflects that the photographs were used to discuss the

---

[3] Fifty photographs were attached to the post-conviction petition; however, the Petitioner's post-conviction petition and appellate brief specify that he took issue with the above-referenced thirty photographs.

-10-

angle of the fatal shot, the victim's having been struck in the head with the gun, and the victim's defensive wounds incurred during a struggle over the gun. The pathologist testified about the shape of the victim's wounds in comparison to various parts of the gun with which the victim may have been struck. He noted that some of the photographs showed the same thing and stated that some photographs of the gun with the victim's wounds showed portions of the gun that did not cause the wounds.

Trial exhibit 18 showed the victim being treated by emergency medical personnel on a gurney at the crime scene. The victim's eyes were open, and a quantity of blood was visible on the victim's chest and arms, as well as on the medical workers' gloves. The trial record reflects that counsel introduced the exhibit when questioning a crime scene investigator about conditions in which fingerprint evidence might have been found on the victim's door. Counsel apologized to the jury for entering the "gory" photograph and specifically noted for the jury that the victim's hands were covered in blood. During closing arguments, counsel told the jury that he did not wish to show them the photograph solely for its gory nature, and counsel discussed the photograph in support of the Petitioner's credibility.

C. Post-Conviction Court's Order

On November 10, 2020, the post-conviction court entered a written order denying relief.[4] The court found that no grounds existed to file a motion to suppress, that the Petitioner did not show any signs of impairment, and that trial counsel was not deficient for failing to file a baseless motion. The court noted that even if the Petitioner used narcotics on the day of the interview, no evidence existed to suggest that he was impaired. The court elaborated that Investigator Lee saw no signs of impairment and that the video recording reflected that the Petitioner seemed "completely coherent," did not appear to be sleepy, did not slur his words or exhibit physical signs of impairment, was able to recount his memories of events, understood the questions asked, and tried to minimize his conduct. The court discredited the Petitioner's post-conviction testimony to the contrary.

Relative to the accomplice instruction, the court found that counsel was deficient for failing to request it, but that no prejudice resulted. The court explained that the Petitioner's own testimony corroborated the accomplice testimony and that the proof of the Petitioner's presence and role during the attempted robbery was overwhelming. The court noted that Ms. Freeman was not an accomplice and that her testimony corroborated Mr. White's.

---

[4] The Petitioner has not appealed the post-conviction court's decision relative to trial counsel's failure to file a motion for discovery.

-11-

Relative to the crime scene and autopsy photographs, the heading of this section was entitled "Certain Crime Scene Photos." The post-conviction court noted that it had reviewed "the complained of photographs" and that several of the photographs "appear[ed] to depict very similar images." The court found that the manner in which the victim was shot was at issue at trial, including discussion of a struggle over the gun, the victim's having been pistol whipped, the angle of the fatal shot, the positions of the victim and the shooter, and the victim's trying to close the door at the time he was shot. The court concluded that trial counsel was not deficient for failing to object to the photographs, finding that they were not particularly gruesome or shocking and that the trial court would have overruled any objection to them.

Relative to the photograph trial counsel introduced, the court concluded that counsel was not deficient. The court found that counsel sought to establish the amount of blood on the victim in order to address "the reliability of the State's theory" and that counsel used the photograph in closing to argue that the Petitioner fled before the victim was shot.

Relative to closing arguments, the post-conviction court noted that it was constrained to conclude based upon this court's opinion in co-defendant Keith's direct appeal that the prosecutor's comment was improper and that an objection would have been appropriate. See State v. Frederick Keith, No. E2014-00448-CCA-R3-CD, 2015 WL 4366575, at *13-14 (Tenn. Crim. App. July 16, 2015). The court disagreed with the Petitioner's assertion that the comment was more harmful because he testified and found that the comment bore on Mr. White's and Ms. Freeman's credibility. The court found that trial counsel was not deficient, noting that co-defendant Keith's objection had been overruled and that even if counsel had preserved this issue for appellate purposes, this court would have found, as it did in co-defendant Keith's direct appeal, that the error was harmless. The post-conviction court similarly rejected the cumulative error claim, reiterating that the proof of the Petitioner's guilt was overwhelming in spite of the two potential instances of deficiency it identified regarding the accomplice instruction and closing arguments.

## ANALYSIS

On appeal, the Petitioner contends that he received ineffective assistance of trial counsel because (1) counsel failed to file a motion to suppress the Petitioner's police statement due to the Petitioner's intoxication; (2) counsel failed to object to crime scene and autopsy photographs; (3) counsel introduced a prejudicial crime scene photograph of the victim; (4) counsel failed to object to an improper statement made during the State's rebuttal argument; and (5) counsel failed to request an accomplice jury instruction in writing. The Petitioner also asserts that the cumulative effect of these errors deprived him of a fair trial.

-12-

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). We apply the Strickland test to claims of ineffective assistance of trial counsel as well as ineffective assistance of appellate counsel. Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)).

The burden in a post-conviction proceeding is on the petitioner to prove allegations of fact by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

### a. Motion to Suppress

The Petitioner contends that trial counsel provided ineffective assistance by failing to file a motion to suppress his police statement, arguing that he was intoxicated and unable to intelligently, voluntarily, and knowingly waive his rights. The State responds that the record does not reflect that the Petitioner was intoxicated.

Contrary to the Petitioner's post-conviction testimony that he remembered almost none of the interview after taking drugs, Investigator Lee testified at the post-conviction hearing that the Petitioner did not seem intoxicated to any concerning degree during the interview. The post-conviction court credited Investigator Lee and discredited the Petitioner in this regard.

We agree with the post-conviction court that the Petitioner has not presented any credible evidence that he was intoxicated at the time of the interview. The Petitioner's behavior as captured by the recording showed that he behaved appropriately and actively participated in the interview after Investigator Lee explained his rights. The Petitioner's posture, movements, and speech were not consistent with intoxication to the point that he was impaired. Trial counsel was not deficient for failing to file a mertiless motion, and the Petitioner has not proven that any such motion would have been granted. The Petitioner is not entitled to relief on this basis.

### b. Crime Scene/Autopsy Photographs

The Petitioner contends that trial counsel provided ineffective assistance by failing to object to the admission of crime scene and autopsy photographs. The Petitioner argues that the photographs were irrelevant because it was undisputed that the victim died from a gunshot wound and that the photographs were unduly prejudicial in light of their low probative value. The Petitioner avers that because the post-conviction court only addressed

the crime scene photographs by name in its order, the record is insufficient for this court to review the post-conviction court's decision regarding the autopsy photographs. The Petitioner requests that we remand this issue for further findings of fact and conclusions of law.

The State responds that the post-conviction court implicitly addressed both sets of photographs in the substance of the order by finding that the photographs, plural, were not overly gruesome or shocking. The State notes that the Petitioner only addressed one crime scene photograph, trial exhibit 5B, in his post-conviction petition and the evidentiary hearing. Likewise, the State argues that the Petitioner has waived any issue related to other crime scene photographs for failure to raise them in the court below. Finally, the State avers that the Petitioner has changed legal theories on appeal relative to the autopsy photographs and has waived this issue.

We agree with the State that the post-conviction court's order, while not ideally worded, implicitly includes all of the disputed photographs. The Petitioner attached color copies of the photographic exhibits to the post-conviction petition, which included one crime scene photograph and numerous autopsy photographs. The post-conviction court's order would not make sense if it referred only to the singular crime scene photograph using language indicating that it had considered multiple photographs. Accordingly, the record is sufficient for our review of this issue.

We conclude that the Petitioner has not established that trial counsel was deficient for failing to object to exhibit 5B. The photograph is not overly gory or shocking, and there is no indication that the trial court would have sustained an objection to it. Given that counsel introduced a similar photograph to demonstrate the amount of blood on the victim at the crime scene and that counsel discussed blood evidence at some length to argue that the Petitioner's testimony was credible, the evidence fails to establish that counsel's decision was not tactical.

Relative to the autopsy photographs, the State is correct that the post-conviction petition only complained that they were cumulative, duplicative, and a waste of time. See Tenn. R. Evid. 403 (stating that relevant evidence may be excluded "by considerations of . . . waste of time, or needless presentation of cumulative evidence"). Similarly, at the post-conviction hearing, post-conviction counsel argued that the autopsy photographs were duplicative. In contrast, the Petitioner argued in his appellate brief and at oral argument that the autopsy photographs should have been excluded as irrelevant to any issue in dispute at trial and, alternatively, unduly prejudicial. See Tenn. R. Evid. 401, 403 (stating the standard for relevance and that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice," respectively). The

-15-

Petitioner may not assert different legal theories for the first time on appeal, and this issue has been waived in this regard. See State v. Adler, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001).

Although the State avers that this court may examine the photographs using the Petitioner's initial contention that the autopsy photos were duplicative, the Petitioner did not include law or argument to that effect in his appellate brief. Accordingly, he has also waived our consideration of the issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument [or] citation to authorities . . . will be treated as waived in this court."). We briefly note that although some of the autopsy photographs were similar to one another and perhaps not strictly necessary, they are far from shocking or prejudicially gory. Nothing in the record indicates that an objection to the photographs would have been sustained or that the photographs prejudiced the Petitioner, particularly in light of the strong evidence of his guilt. The Petitioner is not entitled to relief on this basis.

c. Defense Photograph

The Petitioner avers that trial counsel provided ineffective assistance by introducing trial exhibit 18, which showed the victim's torso and face as he was being treated by emergency medical personnel on a gurney at the crime scene. The State responds that the Petitioner has failed to prove that the decision was not tactical and that counsel was not deficient.

A significant amount of trial testimony addressed blood evidence at the crime scene. After introducing the photograph during the crime scene investigation testimony, trial counsel used it in closing to support the Petitioner's credibility. The Petitioner testified at trial that when he told co-defendant Keith that he no longer wished to rob the victim, co-defendant Keith took the Petitioner's baseball hat and walked to the victim's door. Counsel argued that because co-defendant Keith's toboggan, which was found on a ledge outside the victim's apartment, contained only two drops of blood and no "transfer" or smear marks, co-defendant Keith placed it on the ledge before the attempted robbery such that the victim never touched it. In sum, trial counsel used the blood evidence, including exhibit 18, to support the Petitioner's version of events. The Petitioner has failed to establish that trial counsel's decision to enter the photographic exhibit was not tactical.

As the State observed at oral argument, the Petitioner's assertion that the photograph showed the victim's open eyes at or near the time of his death is incorrect. At trial, the evidence established that the victim died in the hospital after undergoing surgery, and when trial counsel entered the exhibit, he noted that the victim was alert and being treated by medical personnel. The photograph was almost identical to trial exhibit 5B relative to the

-16-

amount of blood visible, and the then-living victim's face, which was in a neutral expression, was not so shocking or graphic as to affect the outcome of the trial. The Petitioner has failed to establish deficiency or prejudice, and he is not entitled to relief on this basis.

### d. Prosecutorial Misconduct

The Petitioner contends that trial counsel rendered ineffective assistance by failing to object to the State's impermissibly vouching for Mr. White's and Ms. Freeman's credibility during closing arguments. The Petitioner acknowledges that in co-defendant Keith's direct appeal, this court concluded that the same error was harmless. However, the Petitioner argues that because he testified at trial, the vouching was an implicit comment on the Petitioner's credibility and, as such, it was not harmless. The State responds that counsel was not deficient and that the Petitioner was not prejudiced.

During rebuttal argument, the prosecutor stated the following:

I want to touch just very briefly on another issue that [was] raised by [co-defendant Keith's counsel], and that is—and to some degree by [trial counsel], regarding Anthony White's testimony and the fact that he had an agreement with the [S]tate, and I think the [c]ourt would not object to me telling you that the [S]tate has an ethical duty here to only proffer evidence and testimony that is credible. Okay. It's an ethical duty that I take very seriously, and the [S]tate would not have proffered Anthony White or Natalie Freeman if the [S]tate wasn't sure and secure that the evidence supported and corroborated—

Co-defendant Keith's counsel objected at this point. The trial court overruled, stating, "I think it is appropriate argument." The prosecutor continued:

So when you consider what Anthony White said, I want you to consider it in the context of other evidence, because, yeah, Anthony did have problems. He was obviously using drugs. He had some mental health issues. There are . . . a number of things that were wrong with that young man, but the fact is that everything that he told you is supported by other evidence and other proof in this case, and it strikes me as odd that both of these lawyers are telling you to disregard what Natalie Freeman and Anthony said that hurts their case, but, hey, when it helps them, you know, you're entitled to believe that.

-17-

After the jury retired, co-defendant Keith's counsel reiterated his objection and stated that the prosecutor's comment about her "ethical duty" vouched for the credibility of the State's witnesses and implied that defense counsel had a different ethical duty and that "testimony that [counsel] presented or otherwise elicited" was false. The prosecutor responded that she referred to her ethical duty because she had been "accused of suborning perjury and by cutting deals" in the defense's closing. She further argued that the statement was made "in the context of having the jury understand and consider the evidence, the testimony of those two witnesses as it related to the other proof and the evidence that corroborated what they said[.]" The trial court found that the comment was appropriate in the context of rebuttal argument, denied relief, and declined to give a curative instruction.

In co-defendant Keith's direct appeal, this court agreed that the prosecutor's statement about her ethical duty constituted "an attempt to vouch for White's and Freeman's credibility." Keith, 2015 WL 4366575, at *14. This court concluded, however, that co-defendant Keith's substantial rights were not affected because "the prosecutor's improper argument was brief and tempered somewhat by her immediately stating that the evidence corroborated White's and Freeman's testimony" and because the State's proof against co-defendant Keith was "strong." Id. (citing Tenn. R. App. P. 36(b)).

The record supports the post-conviction court's conclusion that the Petitioner was not prejudiced by trial counsel's failure to object to the improper argument. Although trial counsel was deficient in this regard, we do not agree with the Petitioner that counsel's failure to object "was fatal to [the Petitioner's] defense which hinged on his credibility." As this court noted in co-defendant Keith's appeal, the improper comments were brief. In addition, other substantial evidence bore on the Petitioner's credibility—most notably, his police statement and testimony. The Petitioner is not entitled to relief on this basis.

e. Accomplice Instruction

The Petitioner contends that trial counsel rendered ineffective assistance by failing to request an accomplice jury instruction, arguing that Ms. Freeman and Mr. White were accomplices and that their testimony was not adequately corroborated. The State responds that the error was harmless because the accomplice testimony was adequately corroborated.

We agree with the post-conviction court that trial counsel's failure to request an accomplice instruction was deficient. However, the Petitioner has not proven that he was prejudiced in this regard.

The Petitioner disputes at some length the post-conviction court's finding that Ms. Freeman was not an accomplice. It in unnecessary for us to consider this underlying issue because even if Ms. Freeman were an accomplice, the accomplice testimony was amply

-18-

corroborated in this case by the physical evidence and the Petitioner's testimony and police statement. Mr. White, Ms. Freeman, and the Petitioner testified that the two men and co-defendant Keith discussed a plan to rob the victim. The Petitioner confirmed during his testimony that he brought his grandfather's gun, went with Mr. White and co-defendant Keith to the victim's apartment complex, gave co-defendant Keith the gun, and walked to the victim's apartment with co-defendant Keith. Ms. Freeman and Mr. White testified that co-defendant Keith reported that the gun went off while he and the victim struggled over it. The physical evidence at the crime scene and on the victim's body corroborated that the the victim injured his hands with the gun, which was consistent with a struggle, and that both the Petitioner and co-defendant Keith left their hats at the crime scene. This evidence was sufficient to establish the Petitioner's criminal responsibility for the victim's death, and the Petitioner has provided no proof that he would have been acquitted but for trial counsel's deficiency. The Petitioner is not entitled to relief on this basis.

### f. Cumulative Error

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare" and require that there has "been more than one actual error committed in the trial proceedings." Id. at 76-77.

> A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the [State's] case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

Id. at 77 (quoting United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993)

We have identified two instances of deficiency in this case, trial counsel's failure to request an accomplice instruction and counsel's failure to object to the State's closing argument. The errors were arguably connected, as both bore on the weight and interpretation of the accomplice testimony. Neither error was corrected by the trial court. Although the comment in closing was brief, the lack of an accomplice instruction was more significant; however, we have determined, as this court did in co-defendant Keith's direct

-19-

appeal, that the accomplice testimony was adequately corroborated. The State's evidence of the Petitioner's participation in the robbery was very strong, and the Petitioner admitted to discussing the robbery with co-defendant Keith, providing the gun to him, communicating with the victim to arrange a meeting at his apartment, traveling with Mr. White and co-defendant Keith to the victim's apartment complex, and walking up to the victim's door. Considering the context of the trial as a whole, we conclude that the aggregate effect of these two errors did not deprive the Petitioner of a fair trial. He is not entitled to relief on this basis.

## CONCLUSION

In consideration of the foregoing, the judgment of the post-conviction court is affirmed.

D. KELLY THOMAS, JR., JUDGE